[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10740

_____

ASPEN AMERICAN INSURANCE COMPANY,
Tessco Technologies Inc.,

Plaintiff-Appellant,

*versus*

LANDSTAR RANGER, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cv-00578-BJD-LLL

_____

Before WILSON, JORDAN, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

In this appeal, we must decide whether the express preemption provision of the Federal Aviation Administration Authorization Act ("FAAAA") bars Florida negligence claims against a transportation broker based on the broker's selection of a motor carrier and, if it does, whether the Act's "safety exception" allows those claims to proceed. *See* 49 U.S.C. § 14501(c)(1)–(2).

Tessco Technologies Inc. hired Landstar Ranger, Inc. as a transportation broker to secure a motor carrier to transport an expensive load of Tessco's cargo to a purchaser across state lines. But Landstar mistakenly turned the shipment over to a thief posing as a Landstar-registered carrier, who ran off with Tessco's shipment. Tessco's insurer, Aspen American Insurance Company, sued Landstar, claiming Landstar was negligent under Florida law in its selection of the carrier.

The district court dismissed Aspen's negligence claims against Landstar, concluding those claims were expressly preempted by the FAAAA, which bars state-law claims "related to a price, route, or service of any motor carrier . . . , broker, or freight forwarder with respect to the transportation of property." *Id.* § 14501(c)(1). The court also determined that the statute's safety exception—which states that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to

motor vehicles," *id.* § 14501(c)(2)—was inapplicable to negligence claims against a broker based on stolen goods. We affirm.

## I.

The domestic trucking industry consists of several players, including the shipper, the broker, and the motor carrier. The shipper is the "person who . . . owns the goods being transported"—like a manufacturer, retailer, or distributor. *See* 49 U.S.C. § 13102(13) (defining "individual shipper"). The motor carrier is the truck driver—the person who transports the goods from the shipper to the purchaser. *See id.* § 13102(14) (defining "motor carrier"). The broker is the person who connects the shipper and carrier; he acts as the middleman between the two to arrange for the transportation of the shipper's goods by the carrier by, for instance, negotiating rates and routes. *See id.* § 13102(2) (defining "broker"); 49 C.F.R. § 371.2(a) (same).

The following facts come from Aspen's complaint. In this appeal from a dismissal for failure to state a claim, we accept these factual allegations as true and construe them in the light most favorable to Aspen. *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022). Landstar Ranger, Inc. is a transportation broker. To provide motor-carrier services to Landstar's shippers, carriers must register with Landstar and submit bids through its online system. As part of the registration process, carriers create an online profile, where they input company information such as the carrier's physical address, point of contact, email address, and phone

number. Landstar's "protocol" when dispatching a shipment to a carrier is to verify that the carrier's company information matches the data in Landstar's online system.

One shipper, Tessco Technologies, Inc., hired Landstar to arrange the transportation of an expensive shipment of cargo (valued at over half a million dollars) from Colorado to Maryland. Landstar selected L&P Transportation LLC to transport Tessco's shipment. L&P was a Landstar-registered carrier, and its online profile included detailed company information.

But Landstar did not follow its usual carrier-verification protocols when dispatching Tessco's shipment. When it came time for Landstar to turn the shipment over to L&P for transport, Landstar received a call from someone named "James" claiming to represent L&P and attempting to collect the scheduled shipment. Despite noticing discrepancies between the company information provided by "James" and that listed for L&P in Landstar's system, Landstar dispatched Tessco's shipment to James. Unsurprisingly, James was a fraud, and he stole Tessco's cargo.

Tessco filed a claim with its insurance provider, Aspen American Insurance Company, to recover the cost of the cargo. Aspen paid the claim and sued Landstar in the Middle District of Florida, seeking damages caused by Landstar's allegedly negligent selection of a motor carrier. Aspen alleges that Landstar breached its duty as a transportation broker "to retain a reputable motor carrier" to transport Tessco's shipment by "ignoring its own protocols and the information readily available in its system" and was thus

either "grossly negligent" or "negligent" in its selection of the carrier.

The district court dismissed Aspen's suit as expressly preempted by the FAAAA, 49 U.S.C. § 14501(c)(1). And it rejected Aspen's argument that the statute's so-called "safety exception," *id.* § 14501(c)(2), shielded Aspen's negligence claims from preemption.

Aspen appealed.

## II.

We review a district court's dismissal on federal preemption grounds *de novo. Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 915 (11th Cir. 2020).

## III.

The FAAAA's express preemption provision provides, in relevant part, that "States may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . , broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). But the Act also contains certain exceptions to its preemptive scope. Relevant here is the statute's safety exception, which states that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." *Id.* § 14501(c)(2). On appeal, Aspen argues that its negligence claims do not fall within the FAAAA's preemption provision and that, even if they do, they may nonetheless proceed because

they fall within the Act's safety exception. We address these arguments in turn.

*A.*

We start with the scope of the FAAAA's preemption provision. The Supremacy Clause of the United States Constitution preempts—that is, invalidates—state laws that "interfere with, or are contrary to" federal law. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824). We recognize three types of federal preemption: express preemption, field preemption, and conflict preemption.[1] *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021). Express preemption, the only category at issue here, occurs when Congress displaces state law "by so stating in express terms." *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020) (quoting *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985)). In such a case, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

---

[1] The district court mentioned the "complete preemption" doctrine as potentially relevant. That doctrine allows a defendant to remove a case to federal court on the ground that a preemption defense creates federal question jurisdiction. *Gables Ins. Recovery, Inc. v. Blue Cross & Blue Shield of Fla., Inc.*, 813 F.3d 1333, 1337 (11th Cir. 2015). Because we have federal jurisdiction in this case because of the parties' diverse citizenship, we take no position on whether the FAAAA satisfies the standard for complete preemption.

Turning to the text of the statute, the FAAAA expressly bars states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . , broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). There is no dispute that Aspen's state-law negligence claims seek to enforce a "provision having the force and effect of law" subject to FAAAA preemption. *See Nw., Inc. v. Ginsberg*, 572 U.S. 273, 281–84 (2014) (holding "that the phrase 'other provision having the force and effect of law' includes common-law claims"). The parties also agree that Landstar is a "broker" as the FAAAA defines it. *See* 49 U.S.C. § 13102(2); *accord* 49 C.F.R. § 371.2(a). And Landstar does not suggest that Aspen's negligence claims relate to the "price" or "route" of a broker, arguing only that those claims relate to a broker's "service." *See* 49 U.S.C. § 14501(c)(1).

With those preliminaries out of the way, the relevant interpretive question becomes whether Aspen's Florida negligence claims are "related to a . . . service of any . . . broker . . . with respect to the transportation of property." *Id.* Considering the phrase "related to," the Supreme Court has stressed that "[t]he ordinary meaning of these words is a broad one . . . and the words thus express a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (interpreting the preemption provision of the Airline Deregulation Act (ADA), 49 U.S.C. § 1305(a)(1)); *see Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364,

370 (2008) (following *Morales* in interpreting the FAAAA).[2] Consistent with the statute's breadth, the Court held that a state law is "related to" rates, routes, or services if the law has "a connection with, or reference to" them. *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 384) (emphasis omitted). Even if the connection "is only indirect," preemption will follow, so long as the connection is not "too tenuous, remote, or peripheral." *Id.* at 370, 375 (quoting *Morales*, 504 U.S. at 386, 390); *cf. Morales*, 504 U.S. at 390 (holding that the Airline Deregulation Act preempts states from regulating how airlines advertise prices but suggesting state laws forbidding "gambling and prostitution" would survive because "the connection [to airline rates] would obviously be far more tenuous").

To be sure, the FAAAA's preemption provision does contain a caveat that "massively limits the scope of preemption": the statute will not bar state-law claims that relate to a broker's services

---

[2] When Congress sought to preempt state trucking laws as part of its ongoing effort to deregulate the trucking industry, it borrowed language from the ADA's preemption provision. *Rowe*, 552 U.S. at 368. The only language unique to the FAAAA's preemption clause when compared to the ADA's is the phrase "with respect to the transportation of property." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 256 (2013). "And when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (cleaned up). So, we look to cases interpreting similar language in the ADA to help guide our analysis of the FAAAA's preemption provision here.

"in any capacity"—only those services that are "with respect to the transportation of property." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013); 49 U.S.C. § 14501(c)(1). But this limiting language poses no obstacle to preemption here because the text of the FAAAA makes plain that Aspen's negligence claims relate to a broker's services with respect to the transportation of property. The Act defines "transportation" to include "services related to" "*the movement of . . . property*," "including *arranging for*, receipt, delivery, elevation, transfer in transit, . . . and interchange of . . . property." 49 U.S.C. § 13102(23) (emphasis added). And a "broker" is one who "sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or *arranging for, transportation by motor carrier* for compensation." *Id.* § 13102(2) (emphasis added); *accord* 49 C.F.R. § 371.2(a) ("Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier."). The Act's implementing regulations further define "brokerage service" as "*the arranging of transportation . . . of a motor vehicle or of property . . . on behalf of a motor carrier*." 49 C.F.R. § 371.2(c) (emphasis added).

The FAAAA and its implementing regulations thus define the "service" of a "broker" covered by the statute as arranging for the transportation of property by a motor carrier. A "core" part of this transportation-preparation service is, of course, selecting the motor carrier who will do the transporting. *E.g.*, *Miller v. C.H.*

*Robinson Worldwide, Inc.*, 976 F.3d 1016, 1024 (9th Cir. 2020). Indeed, Aspen itself acknowledges that "the broker has but a single job – to select a reputable carrier for the transportation of the shipment. *That's all.*" And this is precisely the brokerage service that Aspen's negligence claims challenge—Landstar's allegedly inadequate selection of a motor carrier to transport Tessco's shipment. Accordingly, these claims have "a connection with or reference to" the service of a broker with respect to the transportation of property. *Morales*, 504 U.S. at 384.

We realize that some district courts have held claims like Aspen's to be outside the scope of FAAAA preemption on the ground that such claims "are generally applicable state common law causes of action" that "are not targeted or directed at the trucking industry." *E.g.*, *Nyswaner v. C.H. Robinson Worldwide Inc.*, 353 F. Supp. 3d 892, 896 (D. Ariz. 2019). But those decisions are incompatible with *Morales*, where the Supreme Court rejected this very line of reasoning in interpreting the similar language of the Airline Deregulation Act. *See* 504 U.S. at 386. In holding that the ADA's preemption clause barred states from using their general consumer protection statutes to challenge deceptive airfare advertising, the Court rejected the argument that the ADA preempts only "state laws specifically addressed to the airline industry," not "laws of general applicability." *Id.* Such an interpretation, the Court reasoned, would read the broad phrase "relating to" out of the statute entirely. *Id.* The same reasoning applies to the FAAAA. "Had the

statute been designed to pre-empt state law in such a limited fash-ion," Congress would have worded it differently. *Id.* at 385.

To be sure, the FAAAA does not preempt "general" state laws (like "a prohibition on smoking in certain public places") that regulate brokers "only in their capacity as members of the public." *Rowe*, 552 U.S. at 375. But Aspen's negligence claims do no such thing. They do not present us with the "general" universe of com-mon-law tort claims that could arise within the domestic supply chain. They assert specific allegations of negligence and gross neg-ligence against a transportation broker for its selection of a motor carrier to transport property in interstate commerce. This applica-tion of the negligence standard would regulate brokers, not "in their capacity as members of the public," but in the performance of their core transportation-related services. *Id.* Consequently, the FAAAA expressly preempts Aspen's claims unless they fall within one of the Act's preemption exceptions.

*B.*

We now consider whether an exception to the preemption statute saves Aspen's claims. Aspen's backup argument for reversal is the FAAAA's so-called "safety exception." That provision pro-vides, in relevant part, that the FAAAA's preemption clause "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A). According to Aspen, its claims against a broker based on negligent selection of a motor

carrier fall within this provision and are thus exempt from preemption. We disagree. For Aspen's claims to fall within the safety exception, (1) the negligence standard must constitute an exercise of Florida's "safety regulatory authority," and (2) that authority must have been exercised "with respect to motor vehicles." *Id.* Although Aspen's claims satisfy the first requirement, they do not satisfy the second.

1.

We agree with Aspen that the negligence standard it seeks to enforce is "genuinely responsive to safety concerns" and thus within Florida's "safety regulatory authority." The Supreme Court has explained that a law is within "the safety regulatory authority of a State" only if the law is "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442 (2002). Although "[t]he Court expressed no opinion as to the scope of [state and] local regulations that are indeed 'genuinely responsive' to public safety concerns," *Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1251 (11th Cir. 2003), the Court reasoned that the exception's "clear purpose" is to ensure that the preemption provision does not encroach upon "the preexisting and traditional state police power over safety," *Ours Garage*, 536 U.S. at 439.

Landstar argues that the Florida negligence standard is not sufficiently related to safety because Aspen's claims seek damages for property loss instead of bodily injury. The district court, too,

distinguished cases holding the exception applicable to negligent-carrier-selection claims arising out of personal injuries sustained during transit. *See, e.g.*, *Miller*, 976 F.3d at 1030–31 (holding negligent-selection claims against brokers stemming from motor vehicle accidents satisfy the safety exception); *Lopez v. Amazon Logistics, Inc.*, 458 F. Supp. 3d 505, 515 (N.D. Tex. 2020) (holding "that personal injury tort claims, including a negligent-hiring claim, are within the scope of section 14501(c)(2)'s exception").

But it makes little sense for the safety exception to turn on whether a plaintiff seeks damages for property loss or bodily injury—the common law negligence standard is the same no matter the damages a breach has caused. Aspen simply alleges that, "[a]s a transportation broker," Landstar "owed a duty" to Tessco "to retain a reputable motor carrier for the transportation of the subject shipment"; Landstar breached this duty by "ignoring its own protocols and the information readily available in its system" in selecting the carrier; and "[a]s a direct result," Aspen "was damaged." It is Landstar's alleged unreasonableness in selecting a carrier to transport Tessco's shipment that Aspen claims violates Florida law, irrespective of the type of damages Aspen sustained as a result.

Moreover, we see no basis to conclude, as Landstar seems to suggest, that tort actions for property damage under Florida law are categorically divorced from safety concerns. Take products liability actions, "[t]he fundamental purpose" of which "is to further public safety in the use of consumer goods." *Porter v. Rosenberg*, 650 So. 2d 79, 81 (Fla. Dist. Ct. App. 1995). A cognizable injury in

such an action is not limited to personal injury; a plaintiff may also bring a products liability action in Florida if a defendant's unsafe product damages the plaintiff's property. *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976) (citing Restatement (Second) of Torts § 402A (Am. L. Inst. 1965)). Safety concerns thus clearly animate some tort standards, even if a breach of those standards leads only to property loss instead of bodily injury.

In fact, safety concerns animate the very sort of tort action that Aspen asserts here. The allegations in Aspen's complaint, we realize, do not specify any subspecies of Florida negligence law that Aspen contends subjects Landstar to liability in this case. Nor was it required to. *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."). But Aspen's allegations are comparable to those underlying claims like negligent hiring, negligent selection, and negligent entrustment of a dangerous instrumentality, each of which is premised on public safety concerns under Florida law. In a negligent-hiring claim against an employer based on injury caused by an employee, for instance, "the ultimate question of liability to be decided is whether it was reasonable for the employer to permit the employee to perform his job in the light of information about him which the employer should have known." *Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744, 751 (Fla. Dist. Ct. App. 1991). And Florida courts have described the employer's duty in such an action as "a duty to exercise reasonable care in hiring and retaining safe and competent

employees." *Garcia v. Duffy*, 492 So. 2d 435, 439 (Fla. Dist. Ct. App. 1986). Florida law also recognizes an action for "negligent selection of an independent contractor," which may be brought against a principal who "fail[s] to exercise reasonable care to employ a competent and careful contractor." *Davies v. Com. Metals Co.*, 46 So. 3d 71, 73 (Fla. Dist. Ct. App. 2010) (quoting *Suarez v. Gonzalez*, 820 So. 2d 342, 345 (Fla. Dist. Ct. App. 2002)). Finally, Florida's "dangerous instrumentality doctrine" reflects a special safety concern with those who negligently place unfit drivers on the road. "Under that long-established doctrine, liability is imposed on the owner of an automobile who voluntarily entrusts the vehicle to an individual who causes damage to others through the negligent operation of the vehicle." *Chandler v. Geico Indem. Co.*, 78 So. 3d 1293, 1296 (Fla. 2011).

Accordingly, the relevant question for our purposes is whether Florida's common law negligence standard, which allows claims against a broker based on negligent selection of a carrier, is "genuinely responsive to safety concerns" and thus within Florida's "safety regulatory authority." Our review of Florida negligence law convinces us that it is. *Cf. Galactic Towing*, 341 F.3d at 1251–53 (holding that a city towing ordinance declaring that "the unauthorized parking of vehicles that cannot be removed constitutes a public nuisance and public emergency effecting the property, public safety and welfare of the citizens" is within the state's safety regulatory authority). In reaching this conclusion, we express no opinion on whether the allegations in Aspen's complaint suffice to state

a claim under Florida law. Nor do we suggest that all of Florida negligence law reflects a genuine safety concern as opposed to, for instance, an interest in cost-spreading. *See Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105 (Fla. 2008) (expressing "the view that the primary purpose of tort law is that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct") (cleaned up). We hold only that Aspen's particular claims seek to enforce a standard that is "genuinely responsive to safety concerns" and thus within Florida's "safety regulatory authority" under 49 U.S.C. § 14501(c)(2)(A).

2.

That Aspen's state-law claims seek to enforce a standard that is within "the safety regulatory authority of a state" is necessary, but not sufficient, to sidestep FAAAA preemption. That standard must also be "with respect to motor vehicles." And, here, we agree with Landstar that it is not.

Neither we nor the Supreme Court has ever squarely interpreted this language in the FAAAA. The Supreme Court has previously "interpreted 'with respect to' in a statute to mean '*direct* relation to, or impact on.'" *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) (quoting *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 506 (1992)) (emphasis added)), *aff'd, Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018) (holding "that a statement is 'respecting' a debtor's financial condition" under 11 U.S.C.

§ 523(a)(2)(B) "if it has a *direct* relation to or impact on the debtor's overall financial status" (emphasis added)). Nonetheless, such phrases can "ha[ve] different relevant meanings in different contexts." *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011); *cf. Patel v. Garland*, 142 S. Ct. 1614, 1632 (2022) (Gorsuch, J., dissenting) ("[T]he word ['regarding'] can have either a broadening or narrowing effect depending on context."). Accordingly, we must determine the ordinary meaning of "with respect to motor vehicles" in the context of the FAAAA's safety exception.

To determine a statute's ordinary meaning, "we look to many sources," including "canons of interpretation" and the statute's "context." *United States v. Bryant*, 996 F.3d 1243, 1252 (11th Cir. 2021). Having examined these sources, we believe that the phrase "with respect to motor vehicles" limits the safety exception's application to state laws that have a *direct* relationship to motor vehicles. This is so for three reasons.

First, as we have already explained, the Supreme Court has determined that the phrase "with respect to the transportation of property" in the statute's immediately preceding subsection "massively limits" the scope of that provision. *Pelkey*, 569 U.S. at 261. Given that reading, it only makes sense to read the similar phrase "with respect to motor vehicles" as similarly limiting the scope of the safety exception that follows. "It would be odd if, in two consecutive subsections of the Code, . . . the same words were read to mean one thing in the first subsection but another in the second."

*Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1159 (11th Cir. 2021). Instead, "[a]ll else being equal, we prefer a reading of the second that coheres with binding precedent as to the first." *Id.; see Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("[A] word or phrase is presumed to bear the same meaning throughout a text . . . ." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012))). Just as the phrase "with respect to the transportation of property" "massively limits" the preemption provision, we read the phrase "with respect to motor vehicles" to impose a meaningful limit on the exception to the preemption provision.

Second, we can ensure that the phrase "with respect to motor vehicles" has an operative effect only by requiring a direct connection between the state law and motor vehicles. The safety exception comes into play only when a state law is covered by the preemption provision because that law is "related to a price, route, or service of any motor carrier . . . , broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Of course, every state law that relates to the prices, routes, or services of a motor carrier, broker who contracts with a motor carrier, or freight forwarder who "uses . . . a [motor] carrier," *id.* § 13102(8), will have at least an *indirect* relationship to motor vehicles—motor vehicles are how motor carriers move property from one place to another. *See id.* § 13102(14). Accordingly, if an indirect connection between a state law and a motor vehicle satisfied the safety exception, then the phrase "with respect to motor

vehicles" would have no meaningful operative effect. That interpretation would thus violate the "basic premise of statutory construction . . . that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991).

Third, this reading leaves a separate field of operation for the other exceptions in the statute. In addition to excluding from preemption "the safety regulatory authority of a State with respect to motor vehicles," the statute also preserves "the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo." 49 U.S.C. § 14501(c)(2)(A). If an *indirect* connection to motor vehicles made a state law "with respect to motor vehicles" for the purposes of the safety exception, then Congress's inclusion of a separate exception to allow states to impose highway route controls and cargo limits would almost certainly be redundant because such controls and limits are indirectly related to motor vehicle safety, too.

Accordingly, a mere indirect connection between state regulations and motor vehicles will not invoke the FAAAA's safety exception. But we believe an indirect connection is all that exists between Aspen's broker-negligence claims and motor vehicles. Once again, a "broker" is "a person . . . that . . . sell[s], provid[es], or arrang[es] for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). A "motor carrier," in turn, is "a person providing

motor vehicle transportation for compensation." *Id.* § 13102(14). And a "broker," by definition, may not provide motor vehicle transportation for compensation; only a "motor carrier" may perform that task. *See id.* § 13102(2) (A "broker" is "a person, *other than a motor carrier*") (emphasis added); 49 C.F.R. § 371.2(a) ("Motor carriers . . . are not brokers within the meaning of this section when they arrange . . . the transportation of shipments which they . . . have accepted . . . to transport."). Finally, a "motor vehicle" is "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation." *Id.* § 13102(16). In light of these definitions, a claim against a broker is necessarily one step removed from a "motor vehicle" because the "definitions make clear that . . . a broker . . . and the services it provides have no direct connection to motor vehicles." *Miller*, 976 F.3d at 1031 (Fernandez, J., concurring in part and dissenting in part).

The specifics of Aspen's complaint make us even more confident that Aspen's claims are not "with respect to motor vehicles" within the meaning of the safety exception. Aspen's complaint says nothing at all about motor vehicles. It explains how carriers register with Landstar, Landstar's protocol for verifying a carrier's contact information prior to dispatch, and how Landstar allegedly neglected this protocol when dispatching Tessco's shipment to "James." And Aspen's negligence and gross negligence counts challenge only Landstar's "selection of the motor carrier." The complaint does not purport to enforce any standard or regulation on

22-10740               Opinion of the Court               21

the ownership, maintenance, or operation of "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation," 49 U.S.C. § 13102(16)—indeed, it doesn't even specify whether James was driving such a device when he absconded with the cargo. Such an "attenuated connection" between Aspen's claims and motor vehicles "is simply too remote" to fall within the safety exception. *Miller*, 976 F.3d at 1031 (Fernandez, J., concurring in part and dissenting in part); *see Creagan v. Wal-Mart Transp., LLC*, 354 F. Supp. 3d 808, 814 (N.D. Ohio 2018) ("Because the negligent hiring claim seeks to impose a duty on the service of the broker rather than regulate motor vehicles . . . the exception does not apply").

Aspen's negligence claims are not "with respect to motor vehicles" under the FAAAA's safety exception. They are thus barred by its express preemption provision.

## IV.

The district court is **AFFIRMED**.

22-10740                 JORDAN, J., Concurring                 1

JORDAN, Circuit Judge, concurring:

I join Parts I, II, III.A, III.B.2, and IV of Judge Brasher's well-written opinion, and concur in the judgment affirming the decision of the district court.

Our determination in Part III.B.2 that the negligence claims at issue are "not with respect to motor vehicles" dooms Aspen's reliance on 49 U.S.C. § 14501(c)(2), the FAAAA's safety exception. In my view, it is therefore unnecessary to address in Part III.B.1 whether the negligence standard Aspen seeks to enforce is within Florida's "safety regulatory authority."